UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:                                              Chapter 11

Alexander Bernard Kaspar,
                                                    Case No.: 18-36862 (cgm)



                        Debtor.
-----------------------------------------------------------x

### AFFIRMATION OF COUNSEL IN OPPOSITION TO THE
### U.S. TRUSTEE'S MOTION TO DISMISS OR CONVERT CASE
### PURSUANT TO 11 U.S.C. § 1112(b)

Alexander Bernard Kaspar, (the "Debtor"), by and through his attorney, Matthew M. Cabrera, Esq., hereby submits this Affirmation in Opposition to the Motion of William K. Harrington, the United States Trustee ("U.S. Trustee") for the aforementioned relief, in which he seeks to convert and/or dismiss the Debtor's Chapter 11 case pursuant to 11 U.S.C. § 1112(b)(4). The basis for said relief is set forth in the Memorandum of Law submitted by Alicia M. Leonhard, Esq., ("Leonhard") the Trial Attorney appointed by the U.S. Trustee to oversee the Debtor's case.

Based on the totality of the circumstances, it is within the best interests of all parties involved to allow the matter to proceed under the protections of Chapter 11 reorganization, as the Debtor anticipates that he will be able to submit a plan of reorganization and confirm such a plan.

### INTRODUCTION

1. On November 4, 2018, the Debtor filed a voluntary petition for relief under Chapter 13 of Title 11 of the United States Bankruptcy Code.

2. The Debtor continues to operate manage his properties as a debtor and debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

3. Alicia Leonard, Esq. was appointed and serves as the Chapter 11 Trustee in this case.

4. To date, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") has not appointed a creditor's committee in the Chapter 11 case, nor has any trustee or examiner been appointed therein.

5. After various complaints from the Town of Putnam Valley ("Town") and a subsequent notice of violations received from the New York Department of Environmental Conservation ("NYSDEC"), the Debtor was forced to cease operations of his mulching and aggregate operations.

6. Litigation ensued from the Town and a receiver was appointed by the Putnam County Supreme Court. The receiver was charged with the responsibility of remediating parcel no. 72.1-47.

7. After nearly six years of no action by the receiver as to remediation of the parcel and a foreclosure action pending on another parcel the Debtor filed for bankruptcy protection.

8. The Town moved early in the case for the reimposition of the receiver to finalize a sale of the Property as previously ordered by the Putnam County Supreme Court.

9. The receiver failed to comply with the procedures, rules, and orders of the Bankruptcy Court for the first year of the case.

10. By Order dated December 16, 2019, the receiver was removed, and the Debtor placed in control of the Estate.

11. The Town filed an appeal of the Courts decision to remove the receiver.

12. The Debtor filed a motion to dismiss the Town's appeal on the basis that the Town had no standing to appeal the Court's decision to remove the receiver.

13. The Debtor retained a real estate broker (the "Broker") in March of 2020, and the Broker was approved by the Court on July 27, 2020.

14. On November 6, 2020, the Debtor filed an adversary complaint to compel turnover of Cimarron Ranch property and remove a hold over tenant who had been on the Ranch with no lease

2

agreement with the receiver for nearly five years paying only $1000 month to operate the ranch previously operated by the Debtor.

15.     On November 23, 2020, the Appellate Court directed the parties to file motions addressing the mootness of the Town's appeal.

16.     On February 2, 2021, the Debtor filed a motion to approve a sale to Lost Domain for $1, 950,000.00.

17.     On March 31, 2021, the Appellate Court in a thirty-eight (38) page opinion denied the Debtor's motion to dismiss the Town's appeal.

18.     On April 12, 2021, a Stipulation and Order dismissing the adversary complaint against the hold over tenant was approved by the Court.

19.     On April 20, 2021, a Stipulation dismissing the Town's appeal with prejudice was approved by the Court.

20.     On May 13, 2021, the Appellate Court dismissed the Town's Appeal.

21.     After a period of due diligence, Lost Domain decided to terminate its interest in purchasing the parcels and failed to consummate the sale transaction. The motion for approval was withdrawn by the Debtor.

22.     The Debtor and co-owner of the parcels paid post-petition property taxes totaling $96,214.96 between July and August of 2021 and made payments of $3711 in November and December as part of a repayment plan offered by the County for a total repayment of $103,636.96 between July and December of 2021.

23.     Environmental Consulting and Management Services ("ECMS"), the company retained to assist the Debtor in planning and remediating the alleged contaminated parcel has completed its

preliminary review, drafted a preliminary plan for remediation and submitted that plan for review and approval to the New York State Department of Environmental Conservation ("NYSDEC").

24. On November 8, 2021, the Debtor filed a motion to sell two parcels of the Estate to Hudson Highlands Land Trust ("HHLT").

25. On or about November 9, 2021, ECMS received approval from the NYSDEC of the remediation plan.

26. On December 8, 2021, the motion to sell the parcels was approved by the Court.

27. The two parcels were sold on December 30, 2021, providing a tax payment of $234,299.58, along with setting aside $400,000.00 to use toward the remediation plans and $153,220.93 to the Debtor to fund ongoing operations, pay post-petition taxes and potentially fund a plan (*See* Kaspar Affidavit Exhibit E).

    I.    **The Debtor has Failed to Disclose Crucial Financial Information Fully and Openly**

        A.  **Monthly Operating Reports**

28. All operating reports for the Debtor have been filed to date that are due to be filed through December 2021.

29. The reports have been reasonably consistent regarding income and reasonably consistent regarding expenses. The reports have shown the same or similar income and the same or similar expenses month over month for the entire three plus years this case has been open.

30. All quarterly fees to the Trustee have been timely paid by the Debtor throughout the course of this bankruptcy.

31. The Debtor has provided the documents for his monthly operating reports ("MOR's") timely each month to counsel. In general, the Debtor sends counsel the documents by the third of any given month.

32. It is the fault of counsel and not the Debtor that the monthly operating reports were not filed on or before the 15th of each month.

33. Counsel's reason for drafting and filing the MOR's late is due to being understaffed for the last eighteen months. Counsel's office has been without an additional attorney since the summer of 2020 and has been short administrative staff since the beginning of 2021.

34. Counsel has been actively looking and trying to interview an attorney replacement but has been unsuccessful in all attempts. The number of people responding to advertisements for a position is nearly 80-90% less than in the past and this has resulted in counsel only interviewing less than five candidates in the last eighteen months.

35. Counsel has tried to use virtual attorney arrangements, but these types of arrangements have not proven a viable alternative. Counsel has hired two administrative people in the last year, and both left within a week of being hired stating various Covid concerns and the need to be physically present in the office to complete their tasks.

36. Counsel has worked hard to comply with this requirement, but unfortunately counsel must admit that the MOR's have been filed late.

37. Counsel acknowledges and accepts responsibility for this failure and the reasons given, albeit true, are not acceptable reasons in the opinion of the Court for the failure to timely file the MOR's.

38. The failure of counsel to timely file the Debtor's reports should not be held against the Debtor in this case. Counsel and the Debtor have discussed this matter at length and counsel will file all ongoing MOR's on or before the fifteenth of the month.

39. If the Court were to order the disgorgement of counsel's fees in relation to the late filed reports this would be a punishment that effects only counsel as it should, but to dismiss the case due to

the failure of counsel and not the Debtor to file timely reports would not be in the best interest of the Estate.

### B. Failure to make full and open disclosure of Ms. De Libero's Payments

40. The Debtor made multiple disclosures of the tax payments to the Court.

41. The Debtor specifically disclosed information regarding the tax payments in the May 3, 2021, status report. "The Debtor has advised counsel of his plans to address the post-petition tax arrears in the next ninety days. The co-owner of the property is expecting to receive funds that should be sufficient to resolve the outstanding tax arrears in the next ninety days." (*See* Kaspar Affidavit Exhibit A).

42. The Debtor again specifically disclosed information regarding the tax payments in the August 20, 2021, status report. "The Debtor has made payment toward the tax arrears on parcel 72-1-47 in the amount of $63,519.88. This amount appears to pay the outstanding taxes for 2019 and 2020.". (*See* Kaspar Affidavit Exhibit A).

43. The Debtor for a third time disclosed information regarding the tax payments in the October 1, 2021, status report. "The debtor has made full payment toward the tax arrears and current taxes on parcel 72-1-47 and parcel 72.19.-1-29." (*See* Kaspar Affidavit Exhibit A).

44. The Debtor for a fourth time disclosed information concerning the tax payments in the October 29, 2021, status report and provided detailed numbers and further advised the Court that the co-owner was the source of the payments. "The Debtor, via the co-owner on the parcels, has made full payment toward the tax arrears and current taxes on parcel 72-1-47 and parcel 72.19.-1-29. Total taxes paid on 72-1-47 are 2019 - $33,291.23, 2020 - $30,228.65 and 2021 - $28,521.11. Total taxes paid on 72.19-1-29 are 2019 -$1580.42, 2020 - $1405.87 and 2021 $1187.68." (*See* Kaspar Affirmation Exhibit A).

45. In a further attempt to respond to questions raised by the UST and clarify the tax payment information the Debtor filed a supplemental status report on December 3, 2021 (*See* Kaspar Affirmation Exhibit A).

46. What failed to happen in this case was counsel reporting the monetary amount paid directly by the co-owner on the monthly operating report in the months the payments were made. This was counsel's oversight due in part to the continued excessive workload counsel is under due to understaffing.

47. After ongoing communications with the UST's office concerning the lack of inclusion of the monetary amounts paid, counsel initially included the full amounts paid by the co-owner on the November 2021 MOR, but will file amended MOR's for July, August, September, and November to disclose the third-party funds on the MOR's for the Debtor in the appropriate location on the new UST MOR form within the appropriate month.

48. It is counsel's memory that he has amended only two MOR's in this case in three years. Counsel cannot recall the Trustee raising any other reporting concerns or failure to report concerns or questioning counsel regarding any other MOR during the three years of this case.

49. Counsel recalls the Trustee raising issues regarding Mr. Donahue's MOR's.

50. The Debtor disclosed the tax payments on five occasions starting May and continuing into December.

51. The Debtor further disclosed the exact amounts of the payments and the fact that the payments were made by the co-owner of the property on subsequent reports.

52. The co-owner of the property had an obligation to pay the taxes owed on the property separate and apart from the Debtor's responsibility. The payment by the co-owner was not any attempt to fund a plan it was simply a property owner paying required property taxes. Ms. De Libero is not simply a third party in this case as the Trustee sets forth in her motion.

7

53.     Ms. De Libero owns fifty percent (50%) of all the land and owns fifty percent (50%) of the apartment in New York City.

54.     Ms. De Libero has a responsibility independent of the Debtors responsibility to pay all the property taxes accruing on all the real estate owned jointly with the Debtor.

55.     All post-petition tax debt owed on parcels 72.-1-47, 72.19-1-29 and 83.-1-1 have been paid in full and the agreement with Putnam County currently before the Court for approval, will bring current the taxes due on parcel 72.1-50.  The Debtor has satisfied all post-petition tax debt at this time.

### C. Transparency regarding Environmental Consulting and Management Services

56.     The Debtor has advised the Court and all interested parties of the progress of ECMS from the time ECMS was approved in this case.

57.     The Debtor has reported to the Court any updates provided by ECMS regarding the remediation investigation and submittal of a remediation plan for approval with NYSDEC".

58.     The Debtor commented regarding ECMS in the July 14, 2020, September 14, 2020, November 27, 2020, March 5, 2021, April 6, 2021, May 3, 2021, June 21, 2021, August 20, 2021, October 1, 2021, and October 29, 2021 status reports (*See* Kaspar Affidavit Exhibit B).

59.     The Debtor commented regarding ECMS in the October 29, 2021, status report and included the specific response from the NYSDEC regarding the remediation plan submission (*See* Kaspar Affidavit Exhibit B).

60.     At no time in this case, that counsel can recall has any party requested that counsel for the Debtor provide additional information regarding the actions or activities of ECMS.

61.     It is disingenuous at this point to argue that the Debtor is being less than transparent regarding ECMS having mentioned and provided updates regarding ECMS in nearly every status report filed since July of 2020.

62. In August of 2021, the Debtor and ECMS spoke and ECMS provided the Debtor with an estimated remediation cost. ECMS advised the Debtor that this was only an estimate and that at this point this was not a figure that could or would necessarily be the actual costs, but that based upon the remediation plan submitted to the NYSDEC, without substantial changes and before approval from the NYSDEC, this was an estimate that they could provide the Debtor to use in furtherance of his calculations of what potential amounts he needed to obtain from the sale of the properties in furtherance of the case.

63. Due in part to the fact that ECMS had not received approval from the NYSDEC and as such, the numbers could change depending upon what if anything the NYSDEC requested in addition to what was already in the provided plan and that ECMS specifically advised the Debtor that this was only an estimate he could use, counsel did not request the estimate from ECMS nor mention any specific dollar amount in any filings.

64. In preparation of the Order approving the sale motion, counsel contacted ECMS directly and requested that they confirm the estimate of the remediation costs that counsel had been made aware of from the Debtor.

65. ECMS confirmed that the NYSDEC had not requested any additional items be added to the plan submitted, that the plan submitted had been approved by the NYSDEC and that they were satisfied with providing counsel with the estimated remediation costs as they had calculated (*See* Kaspar Affirmation Exhibit D).

66. The plan for the remediation of Cimarron Ranch has been approved by the NYSDEC without any additions, exclusions (*See* Kaspar Affidavit Exhibit C).

67. The information the Trustee is using in support of this motion is information that was used by the Town inappropriately, but repeatedly in their State Court filings and created by Mr. Donahue. The

9

information is unsupported, unapproved, unsubstantiated, and completely incorrect (the "Donahue Remediation Plan").

68. Mr. Donahue and the Town may have wanted to believe the Donahue Remediation Plan used by the Town as an attachment to their proof of claim for a fictitious remediation cost, but it still does not make the report accurate or a report that should have been relied upon by the State Court or the Trustee (*See* Trustee's Exhibit 11).

69. The Donahue Remediation Plan, created in June of 2013 was never approved by the NYSDEC. It is unknown but believed that the plan was never submitted to the NYSDEC. The Donahue Remediation Plan was around for five years before the Debtor filed for bankruptcy. Neither the Town nor Mr. Donahue or Mr. Donahue's attorney thought it appropriate or proper to obtain approval of this plan with the NYSDEC before passing it off as a real verified plan.

70. This did not stop the Town and Mr. Donahue from relying on and referring to it repeatedly in State Court filings as support for the actions they were demanding the State Court grant them authority to take. One of those actions was the taking and further sale of all the Debtor's real property to pay for a plan that was never approved by the NYSDEC.

71. The Debtor in his status reports to the Court has been transparent and has kept the Court and all parties aware of the actions taken by ECMS regarding the remediation plans for Cimarron Ranch.

72. At no time, until now, is counsel aware of any party requesting additional information regarding ECMS or the actions taken in furtherance of the remediation of Cimarron Ranch.

73. Had such a request been made, counsel would have reached out to ECMS, and requested such information be supplied as counsel did once counsel was made aware of the approval of the proposed plan.

10

74. The Trustee's claim that the Debtor has not been transparent regarding ECMS or the actions being taken in furtherance of the remediation of Cimarron Ranch is without merit.

75. The Trustee's arguments regarding the costs of remediation predicated upon the Donahue Remediation Plan are also without merit.

76. The Debtor has a remediation plan proposed by a remediation company and approved by the NYSDEC. The Debtor has an estimate from ECMS based upon the approved remediation plan and that estimate is $400,000.00.

77. Due to the actions of the Debtor in this case and the sale of Estate assets by the Debtor, the Debtor now has acquired the funds necessary to fund the remediation of Cimarron Ranch.

78. The Debtor has accomplished more in a year and half in this bankruptcy then the Town accomplished in over nine years and the Receiver did in over six years.

79. The actions by the Debtor in this case, albeit somewhat slow, are clearly in the best interests of the Estate and the Debtor's creditors. With Cimarron Ranch finally being remediated, the sale of the parcel should fetch a higher value when sold and add additional funds for the Debtor to distribute to his creditors.

### II.    Debtor's Ability to Effectuate a Plan

80. It was never the intention of the Debtor from the onset of this filing to fund a plan of reorganization from the day to day or month to month income received by the Debtor.

81. It has been mentioned on numerous occasions both in open court and in the pleadings of this case that from day one any plan of reorganization has been predicated upon the sale of the Estate's real property.

82. It has been argued multiple times through-out this case that this case was filed to allow the Debtor to have the ability to sell the parcels of land, free of the State Court imposed receiver and free of

the interference of the Town, to provide sufficient funds to fund a plan of remediation and further fund a plan that repays the Debtor's creditors.

83. The Debtor has moved this case along following this intended plan from day one. All the parcels of land were listed either as a whole group or as individual parcels. Gilbert Lane has an interested buyer, and the Debtor is in ongoing talks with the secured lender to resolve or reach a compromise with the creditor's claims.

84. Back in the late spring, the Debtor made an offer to the secured lender to sell the property and resolve or compromise on their outstanding claim.

85. The secured creditor took some time, but an appraisal of the property was finally conducted and the secured lender in reliance upon that appraisal has turned down the original offer and the Debtor has already spoken with the potential buyer and that buyer is willing to increase his offer to match the appraisal amount. The Debtor is waiting on the new signed contract from the buyer.

86. Cimarron Ranch has interested parties, but those parties have told the Debtor that they want to wait for remediation to be completed before making any offers to purchase that parcel. The remediation of Cimarron Ranch is crucial to selling this parcel. The remediation plan is approved, and the money is already set aside. ECMS has stated they have started the process toward remediating the parcel.

87. The final parcel of land is currently being appraised by HHLT. As this parcel abuts the parcel HHLT bought in December and was a parcel they were originally interested in buying previously, HHLT has expressed an interest in buying it from the Debtor. The parcel is also listed for sale on the MLS.

88. Accepting the Trustee's claim as accurate, the $850,000.00 secured judgment is only secured by real property with an appraised value of $415,000.00 leaving the rest of the money owed to the secured mortgage holder as an unsecured claim.

89. Using the Trustee's Exhibit 2, the only outstanding pre-petition taxes still owed, without accrued interest from May of 2021 should amount to $139,451.28[1]. Accepting the Trustee's claim as accurate the general unsecured claims are $118,000.00.

90. The total amount needed to pay all creditors in full would be $1,107,451.20. An amount that the Debtor reasonably believes is attainable from the sale of the three remaining parcels. The possibility of a 100% payout is attainable in the case, if the case is not dismissed and the Debtor is afforded a reasonable amount of time to finalize the sale of the Gilbert Lane, the remediation of Cimarron Ranch and then the sale of Cimarron Ranch along with the last 110 ac parcel.

91. The Debtor filed a motion in the spring of last year to approve the sale of Cimarron Ranch and the two large parcels directly connected to it for $1,950,000.00. The Debtor has now sold only one of those parcels for $798,000.00. This leaves two other parcels valued at approximately $1,152,000.00. The Trustee states that the Debtor does not have unencumbered property, this statement is untrue. Cimarron Ranch and the 110-acre parcel, lot number 72.-1-50 on Sprout Brook Road are both unencumbered and have a potential sale value of over $1,152,000.00.

92. The total amount of value of the real estate left in this Estate could exceed $1,567,000.00. The total estimated claims in this case amount to $1,107,451.20. The Debtor is not taking into account accruing interest, but it is very possible from these numbers alone, the Debtor could pay 100% of the claims or an amount close to it if this case is left open, the remediation is complete, and all the remaining

---

[1] 2017 and 2018 tax liens for parcels 72.-1-47 and 72.-1-50.

land parcels are sold. Proceeding with this approach would be in the best interests of the Estate and certainly in the best interests of the creditors.

93. The Trustee argues that the Debtor's case should be dismissed because the failure of the Debtor to draft and file a plan to this point is evidence of the inability to draft and file a plan. This argument is without merit. The focus of this case and nearly all the litigation in this case has been centered around the supposed contamination of Cimarron Ranch and who should control the real estate.

94. The Town argued an unsubstantiated claim for years in State Court and then argued it once again in this bankruptcy. The Debtor did what the Town refused to do for nine years and hire an appropriate professional to handle the remediation investigation.

95. ECMS investigated the property and formulated a proposed plan. ECMS then submitted that proposed plan to the NYSDEC and waited for a reply from the NYSDEC. After nine months the NYSDEC approved the proposed plan and ECMS provided a substantiated estimate based upon the approved remediation plan.

96. The Debtor sold two parcels and with the approval and permission of Ms. De Libero, held back from the sale $400,000.00 to fund the estimated remediation costs.

97. It would not have been a benefit to the Estate to draft and file a plan prior to the approval of the remediation plan and receipt of the estimated costs of remediation.

98. This whole bankruptcy filing was prefaced upon removing the receiver, stopping the Town from unduly interfering with the Debtor, preparing a remediation plan, obtaining approval of that plan then selling the parcels to fund the remediation plan and repay the remaining creditors through a plan of repayment.

99. With the approval of the remediation plan from the NYSDEC and after the sale that took place in December, the Debtor is in position to draft and file a disclosure statement and plan.

100. This case needs judicial oversight. The Town has been fighting with the Debtor for over sixteen years over an issue that the Town has been exaggerating about or outright lying about for that entire time.

101. There was never a "landfill" on any of the parcels. There has never been any evidence ever produced by the Town or Mr. Donahue supporting the contention that the Debtor ever operated a "landfill" on any of the parcels, but this did not stop the Town from referring to Cimarron Ranch as a "landfill" in their filings over the years nor the Trustee using this term in the very motion now before the Court [2].

102. The Debtor has an approved remediation report and a verifiable estimate that should now end all discussions regarding the actual state of any contamination on Cimarron Ranch and the process needed to remediate that supposed contamination.

103. The Debtor has previously set forth the Town's interference in this case and is concerned, with just cause, the likelihood of what new interference the Town will attempt regarding the start of the remediation. This Court is best suited at this point to continue to oversee this case and monitor the remediation process and monitor the Debtors use of the remediation funds set aside from the sale.

104. The Court can further oversee the continuing liquidation of the remaining parcels and then the distribution to the creditors. This is in the best interests of the Estate and the creditors.

105. The thought of stripping away the oversight of this Court will likely lead to the Town dragging the Debtor back into State Court and attempting to reinstate a receiver to oversee the plan researched and designed by ECMS. The Town would probably look to try and take control of the Debtor's properties again under some unsupported claim that the estimate from ECMS is invalid and a

---

[2] Page 7-8 of the Trustee's Memorandum in Support "…over remediation of an illegal land fill on the Cimarron Road Property".

million dollars more is needed for remediation. The Town used this argument for years and the State Court believed the argument and is likely to believe these arguments again. This will again lead to unpaid property taxes and unnecessary expenses from any receiver and professionals the receiver needs to hire. The progress made in this case will be completely wiped away.

106.   We have all the professionals we need already in this case and the Debtor has demonstrated that he can do more than any receiver or the Town itself did do or will do in less time.

107.   The actions taken by the Town prior to the filing of bankruptcy, the actions taken by the Town during this bankruptcy, the actions being considered within the Town at this time regarding the remediation process and the likely actions the Town would take if this case were dismissed are unusual circumstances that warrant continuation of this case in bankruptcy court.

108.   As detailed herein, per 11 U.S.C. 1112(b)(2), the within case meets all the exceptions wherein the Court should not dismiss the case.

109.   Section 1112 (b)(2) requires the objecting part to show a reasonable likelihood that (1) a plan will be confirmed within a reasonable time, (2) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A), (3) for which there exists a reasonable justification for the act or omission and (4) that will be cured within a reasonable period of time fixed by the court.

110.   A plan is certainly confirmable in this case and within a reasonable period of time. The Debtor could propose a liquidation plan paying out all his non-exempt equity to the remaining creditors. The Debtor would like time to maximize the sale values of the remaining parcels and a reasonable period of time is necessary for the remediation process to begin and be completed.

111.   The Trustee argued that there were other grounds for dismissing this case other than for cause. The failure to disclose payments from a third party and lack of transparency regarding ECMS.

112. The Debtor disclosed the payments from the third party in the status reports. If any mistake was made it was counsel leaving them off the appropriate MOR's. This was an oversight by counsel that was corrected in November after further communications with the Trustee's office. The further correction of this oversight will be done on amended MOR filings for the months in which the taxes were paid.

113. The Debtor has been fully transparent regarding disclosures concerning or related to ECMS. The Debtor waited until receiving final approval from the NYSDEC to now provide the approved remediation plan and the Debtor waited for the approved remediation plan to disclose the estimated remediation costs as calculated by ECMS. There has been no omission here, but if there was one, the information has now been provided.

WHEREFORE, the Debtor respectfully request that the Court (1) deny the U.S. Trustee's Motion to dismiss and/or convert the Debtor's Case; (2) allow the Debtor's Chapter 11 Case to proceed and (3) grant the Debtor such other and further relief as may be just and proper

        Matthew M. Cabrera, Esq.
        M. CABRERA & ASSOCIATES, P.C.
        2002 Route 17M, Suite 12
        Goshen, New York 10924
        Tel.: (845) 531-5474
        Fax: (845) 230-6645
        Attorney for Debtor

        */s/ Matthew Cabrera*
        By: Matthew Cabrera, Esq.

Dated: January 25, 2022